this appeal is premature.[2]

APPEALS DISMISSED.  COSTS TO BE PAID BY THE APPELLANTS.

538 A.2d 1175

**B.N.**

**v.**

**K.K.**

**Misc. No. 7, Sept. Term, 1987.**

Court of Appeals of Maryland.

March 29, 1988.

136

Susan R. Green and Gary S. Bernstein (Rochlin & Settleman, P.A., on the brief), Baltimore, for appellant.

Joseph F. Devereux, Jr. (Robert L. Devereux of St. Louis, Mo., and Barry C. Steel, Towson, on the brief), for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ADKINS, Judge.

This is a case certified to us by the United States District Court for the District of Maryland pursuant to the Maryland Uniform Certification of Questions of Law Act, Md. Code (1984 Repl.Vol.) Cts. & Jud.Proc. Art. §§ 12–601 through 12–609.  The certified question is:

Does Maryland Recognize A Cause of Action for Either Fraud, Intentional Infliction Of Emotional Distress, Or Negligence Resulting From the Sexual Transmission Of A Dangerous, Contagious, and Incurable Disease, Such As Genital Herpes?

Our answer is affirmative as to each named cause of action, subject to the proviso that there be a proper factual showing in every case. We add, too, that even if a plaintiff makes the requisite factual showing, the defendant, obviously, may raise various defenses. We do not address possible defenses because we have not been asked to do so.

In this case, appellant, B.N. (Ms. N.), has sued appellee, K.K. (Dr. K.), in the United States District Court, under that court's diversity jurisdiction. 28 U.S.C. § 1332. The federal court's certification order instructs us:

The sufficiency of the Plaintiff's Complaint regarding the allegations of the elements of each tort is not part of the certified question. The Court of Appeals is asked to assume the sufficiency of each Count of the Complaint as plead by the Plaintiff [Ms. N.]. The facts are those facts alleged by the complainant in support of her causes of action.

Those facts, or those pertinent to our decision, we now state in summary form.

Between July and December 1983, Ms. N. was employed as a nurse at Johns Hopkins Hospital in Baltimore. For part of the period, Dr. K. also worked there. From July through October of that year, Ms. N. and Dr. K. "were involved in an intimate boyfriend-girlfriend relationship" and "engaged in acts of sexual intercourse." While this was going on, Dr. K. knew he had genital herpes, but never disclosed that fact to Ms. N., who neither knew nor had any reason to believe that Dr. K. "was a carrier of genital herpes." On or about 1 October 1983, Ms. N. and Dr. K. engaged in sexual intercourse. On that date Dr. K. knew that his disease was active and would be transmitted to Ms. N. through sexual intercourse. That result in fact occurred and was caused by Dr. K.'s conduct, Ms. N. never having

engaged in sexual contact with anyone but Dr. K. during the relevant period.

On the basis of these general allegations, as well as some others contained in particular counts, to some of which we shall later refer, Ms. N. charged Dr. K. with fraud (count one); intentional infliction of emotional distress (count two); negligence (count three); and assault and battery (count four).[1]

We shall address each of the first three asserted causes of action, but in an order inverse to that of the counts. By way of preliminary statement, however, we note that although the certified question appears to be one of first impression in Maryland, traditional tort or criminal law concepts have frequently been applied to produce liability for the transmission of contagious disease. We shall apply conventional doctrine here.[2] Before we do so we shall supply a context for our discussion by listing the principal characteristics of genital herpes. Genital herpes is a contagious,[3] painful,[4] and incurable[5] disease that is spread by

---

1. Because of a limitations problem the assault and battery count is not before us.

2. Negligence was the basis for a viable cause of action in cases such as *Smith v. Baker*, 20 F. 709 (Cir.Ct.S.D.N.Y.1884) (whooping cough); *Gilbert v. Hoffman*, 66 Iowa 205, 23 N.W. 632 (1885) (smallpox); *Hendricks v. Butcher*, 144 Mo.App. 671, 129 S.W. 431 (1910) (smallpox); *Earle v. Kuklo*, 26 N.J.Super. 471, 98 A.2d 107 (App.Div.1953) (tuberculosis); and *Kliegel v. Aitken*, 94 Wis. 432, 69 N.W. 67 (1896) (typhoid fever). It was an alternate basis for liability in *Crowell v. Crowell*, 180 N.C. 516, 105 S.E. 206 (1920) (venereal disease). A cause of action for fraud was stated in *De Vall v. Strunk*, 96 S.W.2d 245, 246 (Tex.Civ.App.1936) ("vermin, commonly called crabs"). Assault or assault and battery also was a ground of recovery in *Crowell, supra*, and formed the basis for criminal liability in *State v. Lankford*, 29 Del. (6 Boyce) 594, 102 A. 63 (1917) (syphilis); *Reg. v. Sinclair*, 13 Cox's Crim.L.Cas. 28 (Cent.Crim.Ct.1866) (gonorrhea); and *Reg. v. Bennett*, 4 Fost. & Fin. 1105, 1106, 176 Eng.Rep. 925, 925 (W.Cir.Ct. 1866) (a "foul disease"). As we have already noted, battery is not an issue in the case before us. *See generally,* Annotation, "Tort Liability for Infliction of Venereal Disease," 40 A.L.R.4th 1089 (1985).

3. *See,* Note, *"Kathleen K. v. Robert B.:* A Cause of Action for Genital Herpes Transmission," 34 Case W.Res.L.Rev. 498, 501 (1984) [herein-

---

4-5. See notes 4-5 on page 140.

sexual contact.[6]  It is an infectious disease that endangers public health.[7]

---

after Note, *"Kathleen K."*] ("During attacks, the disease is highly contagious.").

**4.** *See,* M. Oxman, "Genital Herpes," *Infectious Diseases and Medical Microbiology,* 1041, 1044 (2d ed. 1986) [hereinafter Oxman, "Genital Herpes"] ("Genital herpes ... is an acute inflammatory herpes simplex virus ... infection of the male or female genital tract." Most patients experience "tenderness, pain, burning, tingling, or itching" at the site of the impending lesion eruption); Note, *"Kathleen K.", supra,* at 502 (Apart from the open sores themselves, herpes "is associated with itching, burning genitalia, pain on urination, headaches, swollen lymph nodes, general muscular aches, fever, and overall discomfort").

**5.** *See,* Centers for Disease Control, Public Health Service, U.S. Dep't of Health and Human Services, *1985 STD [Sexually Transmitted Diseases] Treatment Guidelines* 14 (Sept. 1985) ("Genital herpes infection is a viral disease which may be chronic and recurring and for which no known cure exists."); *Current Medical Diagnosis & Treatment 1988* at 70–71 (S. Schroeder, M. Krupp, & L. Tierney eds. 1988) ("No present means of treatment can eliminate the hidden foci of infection," and "[t]here is no really safe and effective systemic approach to cure recurrent herpes simplex infections of the skin"); K. Holmes, L. Corey, & P. Pegram, Jr., "Sexually Transmissible Diseases (Venereal Infections)," *Clinical Concepts of Infectious Diseases* 232, 247 (3d ed. 1982) [hereinafter Holmes, Corey, & Pegram] ("While many treatments of genital herpes have appeared in the scientific and lay press, none as yet has been able to eliminate latent viral infection."); and Oxman, "Genital Herpes," *supra,* at 1042 ("[T]his latent infection persists for life and is periodically reactivated by various stimuli (for example, menses, sexual intercourse).").

**6.** *See,* P. Sparling, "Sexually Transmitted Diseases," 2 *Cecil Textbook of Medicine* 1639, 1639 (17th ed. 1985) ("In some cases [of sexually transmitted diseases], such as gonorrhea and genital herpes simplex virus infection, sexual transmission is the only important mode of transmission, at least between adults.").

**7.**  Within the last decade genital HSV [herpes simplex virus] infection has emerged as a disease of increasing incidence and importance, and is now the third most common STD problem.... The occasional complications of genital herpes, such as meningitis and radiculitis; the frequent recurrences; the neo-natal morbidity; and the epidemiologic association with cervical cancer and possibly vulvar carcinoma in situ make it a major health problem.
Holmes, Corey, & Pegram, *supra* at 245. *Also see,* Note, "Liability in Tort for the Sexual Transmission of Disease: Genital Herpes and the Law," 70 Cornell L.Rev. 101, 108 (1984) [hereinafter Note, "Liability"] ("[Genital herpes] is spreading rapidly in the United States. Because

## I. *Negligence*

The traditional elements of a cause of action in negligence may be stated as:

1. A duty, or obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

2. A failure on the person's part to conform to the standard required: a breach of the duty....

3. A reasonably close causal connection between the conduct and the resulting injury....

4. Actual loss or damage resulting to the interests of another....

W.P. Keeton, *Prosser and Keeton on the Law of Torts*, 164–165 (5th ed. 1984) [footnotes omitted] [hereinafter Prosser]. *See also Restatement (Second) of Torts* § 281 (1965). This is the accepted doctrine in Maryland. *Maenner v. Carroll*, 46 Md. 193, 212 (1877); R.P. Gilbert, P. Gilbert & R.J. Gilbert, *Maryland Tort Law Handbook* § 1.4 (1986) [hereinafter Gilbert].

The notion of duty is founded on the "responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others." *Moran v. Fabergé*, 273 Md. 538, 543, 332 A.2d 11, 15 (1975). "When a reasonable person knows or should have known that certain types of conduct constitute an unreasonable risk of harm to another, he or she has the duty to refrain from that conduct." *McCance v. Lindau*, 63 Md.App. 504, 514, 492 A.2d 1352, 1358 (1985). An important factor used to determine the existence of a duty is foreseeability. This test, whether in the context of causation or duty, is "intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where, in the language of Section

---

the disease poses a grave health hazard to the population, the public good requires steps to curtail its transmission.").

435(2) of the *Restatement (Second) of Torts* (1965), it appears 'highly extraordinary' that the negligent conduct should have brought about the harm." *Henley v. Prince George's County,* 305 Md. 320, 334, 503 A.2d 1333, 1340 (1986). By the same token, a duty is readily found if it appears highly likely that the conduct in question should have brought about the harm. *See, Restatement (Second) of Torts* § 435(2) (1965); F. Harper, F. James, Jr., & O. Gray, 3 *The Law of Torts,* 656–659 & nn. 8 & 9 (2d ed. 1986); and Prosser, *supra,* at 298–300.

One who knows he or she has a highly infectious disease can readily foresee the danger that the disease may be communicated to others with whom the infected person comes into contact. As a consequence, the infected person has a duty to take reasonable precautions—whether by warning others or by avoiding contact with them—to avoid transmitting the disease. "Hence, if defendant knew that he was afflicted with smallpox it then became and was his duty to keep away from other persons, or should other persons approach him to notify them of the fact so that they might protect themselves." *Hendricks v. Butcher,* 144 Mo.App. 671, 674, 129 S.W. 431, 432 (1910). It is "well established that one who negligently—that is, through want of ordinary care—exposes another to an infectious or contagious disease, which such other thereby contracts, is liable in damages therefor, in the absence of contributory negligence...." *Kliegel v. Aitken,* 94 Wis. 432, 435, 69 N.W. 67, 68 (1896). And in *Long v. Adams,* 175 Ga.App. 538, 333 S.E.2d 852 (1985), the court held that a woman breached her duty of care when, knowing she had genital herpes, she engaged in sexual intercourse with a man without informing him of that fact. *See also Duke v. Housen,* 589 P.2d 334, 340 (Wyo.), *cert. denied,* 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86 (1979), in which the male appellant escaped liability for negligently transmitting gonorrhea to a female friend, but only because the statute of limitations had run. *See also, S.A.V. v. K.G.V.,* 708 S.W.2d 651 (Mo.1986) (Abro-

gating doctrine of spousal immunity in wife's action charging husband with negligent transmission of genital herpes).

■ As we have seen, Ms. N. has alleged that Dr. K., knowing he had active genital herpes, a highly contagious, sexually transmitted disease, had sexual intercourse with her. *See* nn. 3 & 6, *supra.* If she can prove these allegations, it would be reasonably foreseeable by Dr. K. (or a fact-finder could so conclude) that Ms. N. would be harmed by his conduct. She was a clearly identified potential victim. *See Henley,* 305 Md. at 335–336, 503 A.2d at 1341 (foreseeable identification of a plaintiff is relevant to the determination of a duty to warn). As a consequence, Dr. K. had a duty either to refrain from sexual contact with Ms. N. or to warn her of his condition. If, as she charges, he negligently failed to do either, he breached his duty.

Ms. N. also has alleged that as the direct result of this breach of duty, she contracted a serious, painful, and incurable disease. *See* nn. 4 & 5, *supra.* Her complaint avers facts that, if believed, show the existence of a duty, the defendant's breach of that duty, and actual injury to her proximately caused by the breach. She has stated a cause of action in negligence that is cognizable under Maryland law. For a discussion of the application of negligence principles to the transmission of genital herpes, *see generally,* Note, *"Kathleen K. v. Robert B.:* A Cause of Action for Genital Herpes Transmission,"* 34 Case W.Res.L.Rev. 498, 513–518 (1984) [hereinafter Note, *"Kathleen K."*]; Note, "Liability in Tort for the Sexual Transmission of Disease: Genital Herpes and the Law," 70 Cornell L.Rev. 101, 110–124 (1984) [hereinafter Note, "Liability"]; Note, "HERPES —A Legal Cure—Can the Law Succeed Where Medicine Has Failed?," 61 U.Det.J.Urb.L. 273, 275–279 & 282–283 (1984); Comment, "You Wouldn't Give Me Anything, Would You? Tort Liability for Genital Herpes," 20 Cal.W.L.Rev. 60, 64–73 (1983); and Comment, "The Consequences of an Uninformed Ménage à Trois Extraordinaire: Liability to Third Parties for the Nondisclosure of Genital Herpes Be-

tween Sexual Partners," 29 St. Louis U.L.J. 787, 793–801 (1985).

## II. *Infliction of Emotional Distress*

In *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611, 614 (1977), we agreed "that the independent tort of intentional infliction of emotional distress should be sanctioned in Maryland...." Chief Judge Murphy, writing for the Court, identified the four elements of the tort:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Id.*

Ms. N. avers, in her emotional distress count, that Dr. K., aware of the fact that he had active genital herpes, a contagious and incurable disease that is spread by sexual contact, engaged in sexual intercourse with her, thereby transmitting the disease to her. These allegations suffice, if established, to support the first element of the tort.

Even if Dr. K. did not actually intend to inflict severe emotional distress, it is enough if "he [knew] that such distress [was] certain, or substantially certain, to result from his conduct; or where [he acted] recklessly in deliberate disregard of a high degree of probability that the emotional distress [would] follow." *Harris,* 281 Md. at 567, 380 A.2d at 614. This is so because according to the facts we must take as established for the purposes of this case, Dr. K. knew the nature of the disease, including its painful nature and its incurability, and also that his disease was active at the time he had sex with Ms. N., and that the disease, in its active state, is transmitted through sexual intercourse. *See* nn. 3–6, *supra.* That the transmission of genital herpes is substantially certain to produce severe emotional distress appears from the characteristics of the illness; these characteristics also support the extreme and

outrageous nature of Dr. K.'s conduct, if they are adequately proven.

Ms. N. has alleged specifically the painful and incurable aspects of genital herpes. In addition, this malady is associated with the development of cervical cancer, with the dangers of miscarriage and premature delivery during childbirth, and with a high mortality rate for children, born of mothers who have the disease, who thereby contract herpes at birth.[8] Furthermore, one who has the disease should at a minimum refrain from sexual relations while the disease is in its active stages. Note, "Liability" at 106. *See also* American Public Health Ass'n, *Control of Communicable Diseases in Man* 184 (14th ed. 1985) [hereinafter *Control of Communicable Diseases* ]; and Centers for Disease Control, Public Health Service, U.S. Dep't of Health and Human Services, *1985 STD [Sexually Transmitted Diseases] Treatment Guidelines* 15 & 35 (Sept. 1985). In short, one who has genital herpes may be deprived of most normal sexual activity, marriage may be virtually out of the question, and vaginal childbearing may be practically ruled out. All this is in addition to the pain produced by the disease itself. It is not surprising that the psychological trauma produced by the disease "is often as debilitating as the physical consequences." Note, "Liability" at 107. *See also* M. Oxman, "Genital Herpes," *Infectious Diseases and Medical Microbiology,* 1041, 1049 (2d ed. 1986) ("They [repeated episodes of recurrent infection] produce enough physical and psychological distress to cause most affected persons to seek some form of relief.").[9]

---

**8.** *See* Holmes, Corey & Pegram, *supra,* at 245 & 247 (perinatal transmission results in death (65%) or, in 50% of the survivors, in infant morbidity); and Wallis, "Battling an Elusive Invader," TIME, Aug. 2, 1982, at 68 ("Herpes is lethal to up to 60% of infected newborns. For surviving babies, there is a 50% risk of blindness or brain damage.").

**9.** L. Corey & K. Holmes, "Genital Herpes Simplex Virus Infections: Current Concepts in Diagnosis, Therapy, and Prevention," 98 *Annals of Internal Med.* 973, 981 (June 1983) under the section "Counseling Patients with Genital Herpes" state:

■ One who knowingly engages in conduct that is highly likely to infect another with an incurable disease of this nature, and who also is aware of the nature of the disease, not only engages in intentional or reckless conduct as those terms are defined in *Harris;* he or she has committed extreme and outrageous conduct. We are not dealing here with " 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Harris,* 281 Md. at 567, 380 A.2d at 614 (quoting *Restatement (Second) of Torts* § 46 comment d (1965)). We do not have the simple rudeness and annoying collection efforts that were found not outrageous in *Dick v. Mercantile–Safe Dep. & Trust,* 63 Md.App. 270, 276–277, 492 A.2d 674, 677–678 (1985), or the "bad taste and poor judgment" that did not suffice in *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 60, 502 A.2d 1057, 1064, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986). *See also Continental Cas. Co. v. Mirabile,* 52

---

Anger at falling ill and having pain during outbreaks of acute disease, despair at having an incurable illness, guilt at having acquired a sexually transmitted agent, and helplessness at preventing recurrences are emotions often expressed during the course of infection.... Many patients will benefit from psychological counseling from professionals or from lay support or patient advocacy groups such as the Herpes Resource Center program of the American Social Health Association.

*Also see* Note, *"Kathleen K.", supra,* at 502 (Emotional effects of genital herpes "frequently include shock, emotional numbing, isolation and loneliness, rage and perhaps even serious depression and impotence."). Leo, "The New Scarlet Letter," TIME, Aug. 2, 1982, at 64, states:

Many people who contract herpes go through stages similar to those of mourning for the death of a loved one: shock, emotional numbing, isolation and loneliness, sometimes serious depression and impotence. Often there is a frantic search for a doctor who will give a different diagnosis, or a kind of magical bargaining with the disease ("Maybe if I don't have sex for a while, it will go away"). Almost always there is rage—at the carrier, the opposite sex in general and the medical profession.

The article continues: " 'As time goes on there is a "leper" effect, and some patients describe convictions of their own ugliness, contamination or even dangerousness.' ... Part of the pain for herpes patients is the conviction of being damaged goods.... '[I]ntense guilt feelings' " have been reported. *Id.* at 64.

Md.App. 387, 449 A.2d 1176 *cert. denied,* 294 Md. 652 (1982) (series of petty humiliations not enough). Dr. K.'s actions, as alleged here, certainly were not less outrageous than the stepfather's sexual child abuse that the trial court found adequate in *Reagan v. Rider,* 70 Md.App. 503, 521 A.2d 1246 (1987).

As we said in *Harris,* 281 Md. at 569, 380 A.2d at 615, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous; where reasonable men may differ, it is for the jury to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Assuming proof of the conduct we have outlined as well as the relationship of the parties, we think this case easily crosses the "extreme and outrageous" threshold.

The causal connection between the wrongful conduct and the emotional distress is apparent, if the facts we have recounted, or substantially those facts, are established. The remaining element to consider is the requirement that the emotional distress be severe. Ms. N. has in substance alleged that, and the ultimate outcome must, once again, depend on what she proves.[10] In *Harris* we found insufficient evidence of the necessary severity when the plaintiff showed no more than humiliation, an aggravation of an existing nervous condition, and the worsening of a speech impediment that required no change in the treatment he had been receiving for six years prior to the mistreatment for which he sued. 281 Md. at 572, 380 A.2d at 617. In *Moniodis v. Cook,* 64 Md.App. 1, 16, 494 A.2d 212, 220, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985), on the other hand, Ms. Cook was allowed to recover when she showed, among other things, that as a result of the outrageous conduct in

---

**10.** We also note that "primary genital herpes is more severe in women than in men. Women have a larger area of infection, more intense and prolonged local symptoms, more frequent constitutional symptoms, more extragenital lesions, and more complications." [citations omitted]. Oxman, "Genital Herpes," *supra,* at 1043.

question she was no longer able to perform household chores and had become a recluse. Ms. N. has not charged, at least not expressly, that degree of severity.

■ We do not believe, however, that a showing like that in *Moniodis* is essential to recovery. While the emotional distress must be severe, it need not produce total emotional or physical disablement. *Reagan v. Rider,* 70 Md.App. at 511, 521 A.2d at 1250. *McCaskill v. Barr,* 92 Ill.App.3d 157, 158–159, 414 N.E.2d 1327, 1328, 47 Ill.Dec. 211, 212 .(1980) ("[A] line will be drawn between trivial injuries to the psyche and severe mental disturbances." But "Illinois ... does not require physical injury or disability to accompany, or result from the psychic trauma."). Other courts have indicated that there is a cause of action for intentional infliction of emotional distress with facts not unlike those averred here. *Kathleen K. v. Robert B.,* 150 Cal.App.3d 992, 198 Cal.Rptr. 273 (1984); *Long v. Adams, supra,* (both involving genital herpes). And severity must be measured in light of the outrageousness of the conduct and the other elements of the tort. *Reagan,* 70 Md.App. at 513–514, 521 A.2d at 1251. The nature of the conduct itself may provide evidence of the severity of the distress. *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148 (Me.1979). That is, if "the acts of the defendant are so horrible, so atrocious and so barbaric that no civilized person could be expected to endure them without suffering mental distress, [a] jury may find as a matter of fact that 'severe' emotional distress resulted." *Reagan,* 70 Md.App. at 513, 521 A.2d at 1251 (citing *National Sec. Fire & Casualty Co. v. Bowen,* 447 So.2d 133 (Ala.1983)). *See also,* Oxman, "Genital Herpes," at 1049 (enough physical and psychological distress is produced by the repeated episodes of recurrent infection "to cause most affected persons to seek some form of relief").

■ On the record before us and in a case of this type, we obviously cannot pass on the sufficiency of the evidence as to the severity of Ms. N.'s emotional distress. We can only hold, as we do, that proof of acts such as those we

have outlined establish the first three elements of the tort of intentional infliction of emotional distress under Maryland law. If sufficiently severe emotional distress has been produced by that conduct, in light of all the evidence, Ms. N. is entitled to recover.

## III.  *Fraud*

The elements of the cause of action in what is variously known as fraud, deceit, or intentional misrepresentation are:

(1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation.

*Suburban Mgmt. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326, 329 (1964) [citations omitted]. *See also* Gilbert, *supra,* § 17.1.

It is true that this tort is usually applied in a business setting, or to one in which some pecuniary loss is claimed. *Restatement (Second) of Torts* § 525 comment h (1977). Obviously, this is not that kind of case. But a business setting and pecuniary loss are not necessarily required. *See* James & Gray, "Misrepresentation—Part I," 37 Md.L. Rev. 286, 286 (1977) (misrepresentation "usually, but not necessarily, involves a business transaction between" the parties); and Note, "Deceit and Negligent Misrepresentation in Maryland," 35 Md.L.Rev. 651, 668 (1976) (recovery for negligent words if there is some business or personal relationship causing reliance on the statement, and by its nature, creating a duty to speak truthfully) [hereinafter

Note, "Deceit"]. The *Restatement* sets forth a number of situations in which there may be liability for physical harm (and consequent economic loss) caused by a fraudulent misrepresentation. *See, e.g.,* §§ 554 (spouse who fraudulently conceals from the other spouse a physical condition that makes cohabitation dangerous to the health of the other) and 557A:

One who by a fraudulent misrepresentation or nondisclosure of a fact that it is his duty to disclose causes physical harm to the person ... of another who justifiably relies upon the misrepresentation, is subject to liability to the other.

An example of the application of this principle is found in *Kathleen K. v. Robert B., supra.* There, Kathleen averred that Robert had assured her, before they had sexual intercourse, that he was free of venereal or other dangerous contagious disease, but that as a matter of fact (as he well knew) he had genital herpes. Relying on his misrepresentation, she agreed to the intercourse and as a result, acquired the disease. The court held that she had made out a cause of action in fraud. 150 Cal.App.3d at 996–997, 198 Cal.Rptr. at 276.

The facts of *Kathleen K.* are very close to the facts alleged in the case before us, except that here the charge is that Dr. K. concealed the existence of genital herpes, rather than asserting that he was free of disease.[11] In *Maharam v. Maharam*, 123 A.D.2d 165, 510 N.Y.S.2d 104 (1986), a husband concealed from his wife the fact that he had genital herpes. She sued him for wrongful transmission of the disease. The court concluded that she had established a cause of action in fraud, in part because the marital relationship imposed upon him a duty to speak. 123 A.D.2d at

---

**11.** The opinion in *Kathleen K.* does not make it entirely clear whether it was a case of concealment or affirmative misrepresentation, but the latter is what Kathleen alleged.

169, 510 N.Y.S.2d at 107.[12]  *See also Crowell v. Crowell,* 180 N.C. 516, 105 S.E. 206 (1920).

Dr. K. distinguishes this case from *Kathleen K.* because here there was no affirmative representation as to his good health; he distinguishes it from *Maharam* because here, according to him, there was no duty to speak since there was no marital or other confidential relationship between the parties.  Of course, concealment cannot be the basis of an action in deceit if there is no duty to speak.  But if there is such a duty, the concealment can result in liability to the same extent that an actual denial of the existence of the fact would.  *See Impala Platinum v. Impala Sales,* 283 Md. 296, 323, 389 A.2d 887, 903 (1978); *Schnader v. Brooks,* 150 Md. 52, 57, 132 A. 381, 383 (1926); and *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 232, 469 A.2d 867, 888, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984).  *See also Restatement (Second) of Torts* § 557A (1977), and Gilbert, *supra,* § 17.3.  The question, then, is whether Dr. K. had such a duty.

The parties debate that issue in terms of whether there was a confidential relationship between them.  That approach is suggested by *Maharam* and § 554 of the *Restatement.*  Its resolution is essentially one of fact, for absent some relationship, such as a fiduciary one, which is presumptively confidential, the nature of the relationship—whether one party justifiably placed confidence in the other and whether the other accepted that placement—is for a fact-finder to decide.  *Midler v. Shapiro,* 33 Md.App. 264, 268, 364 A.2d 99, 103 (1976).  *Also see Jones v. J.H. Hiser Constr. Co.,* 60 Md.App. 671, 678, 484 A.2d 302, 305 (1984), *cert. denied,* 303 Md. 114, 492 A.2d 616 (1985) (in view of relationship, there was a duty to disclose the appropriate

---

**12.** An alternative ground for this holding in *Maharam* was a statute making it a misdemeanor to have sexual intercourse with another when infected with a venereal disease.  We have no such statute in Maryland, but see H.B. 1073 (1988), proposing enhanced protective measures, including isolation of carriers, with respect to genital herpes as well as other sexually transmissible diseases.

information).   Other courts have found relationships of trust and confidence in purely personal relationships.

The term [fiduciary] connotes the idea of trust or confidence, contemplates good faith, rather than legal obligation as the basis of the transaction; refers to the integrity, the fidelity of the party trusted, rather than his credit or ability.   It has been held to include those informal relations which exist whenever one party trusts and relies on another, as well as technical fiduciary relations.

*Brown v. Foulks*, 232 Kan. 424, 430, 657 P.2d 501, 505–506 (1983).  *See also Lowrance v. Patton*, 710 P.2d 108, 111–112 (Okla.1985) ("The relationship need not be legal but it may be either moral, social, domestic or merely personal. Therefore, a fiduciary relationship which is recognized and enforced equitably does not rest on any particular legal relationship."); and *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1963) ("a relationship of trust and confidence may be shown to arise informally from purely personal relationships").  *And see Jewish Center of Sussex County v. Whale*, 165 N.J.Super. 84, 397 A.2d 712 (Ch.Div.1978), *aff'd*, 172 N.J.Super. 165, 411 A.2d 475 (App.Div.1980), *aff'd*, 86 N.J. 619, 432 A.2d 521 (1981) (nature of relationship between clergyman and congregation is such that the former, when seeking a spiritual leadership position, has the duty to disclose prior acts of moral turpitude).

We are not about to decide that only a marital relationship would impose a duty to disclose a contagious disease transmitted by sexual relations.  We have recognized that if the likelihood of physical harm is present, certain tort duties may arise under circumstances in which they otherwise would not.  *See Council of Co-Owners v. Whiting–Turner*, 308 Md. 18, 32, 517 A.2d 336, 343–344 (1986) (liability for negligent misrepresentation exists in absence of privity if there is a likelihood of physical harm).  Also, the *Restatement (Second) of Torts* § 557A & comment a (1977) states that "[o]ne who by ... nondisclosure of a fact that it is his duty to disclose causes physical harm to the person ... is subject to liability ..." in a tort action of

deceit. It may be that an ongoing "intimate boyfriend-girl-friend relationship" may give rise to a duty to speak under circumstances like those alleged in this case. As the *Kathleen K.* court said, "a certain amount of trust and confidence exists in any intimate relationship, . . ." 150 Cal.App. 3d at 997, 198 Cal.Rptr. at 276–277.

But the existence of a confidential relationship is not essential to Ms. N.'s cause of action for fraud because, as we hold in Part I of this opinion, Dr. K. had a general tort duty, at the least, to disclose his condition before engaging in intercourse with her. *See Restatement (Second) of Torts* § 557A & comment a (1977), *supra.* That duty he breached, according to the allegations of the complaint. That is, whether the relationship between Ms. N. and Dr. K. was "confidential" in the eyes of the law or whether it was not, it was a relationship which had to make Dr. K. aware that to engage in sexual intercourse with Ms. N. without disclosing his condition would be highly likely to produce severe harm to a readily and clearly identifiable person. *Furr v. Spring Grove State Hosp.*, 53 Md.App. 474, 482, 454 A.2d 414, 417 (1983) (discussing duty toward an identified person). And *see Henley v. Prince George's County, supra,* 305 Md. at 335–336, 503 A.2d at 1341.

Whether Ms. N. reasonably relied upon the implicit representation of good health that resulted from Dr. K.'s nondisclosure is a question of fact depending to some degree on the nature of their relationship; she has alleged reasonable reliance. The implicit misrepresentation was obviously a material one; Ms. N. asserts that she never would have engaged in sex with Dr. K. had she known the truth; she also avers that she suffered damage directly from the misrepresentation. Consequently, she has also stated a cause of action for fraud that is recognized in Maryland.

CERTIFIED QUESTION ANSWERED AS ABOVE SET FORTH. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.